FILED

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

97 JAN 29 PM 12:44

U.S. DISTRICT COURT
N.D. OF ALABAMA

DIANA KENNEDY,                )
                              )
    Plaintiff,                )
                              )
    vs.                       )          CV 96-P-0108-S
                              )
MERCK & CO.,                  )
                              )
    Defendant.                )

**ENTERED**

JAN 2 9 1997

## MEMORANDUM OPINION

    This cause comes on to be heard on a motion for summary judgment filed on November 1, 1996 by the defendant, Merck & Co., Inc., ("Merck").  In its motion, Merck contends that the plaintiff, Diana Kennedy ("Kennedy"), cannot state any claim for a violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 et seq.

    On a motion for summary judgment, the court must assess the proof to ascertain whether there is a genuine need for trial.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  Summary judgment is proper only if the court concludes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c).  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A party seeking summary judgment bears the initial responsibility of informing the court of the grounds for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits that it believes demonstrate the absence of a genuine issue of material fact.  Id. at 323.  Once the moving

party has met this burden, the nonmoving party "must produce evidence that shows there exists a genuine issue of material fact." Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988). Rule 56(e) requires the nonmoving party to go beyond the pleadings and by affidavits, or by the depositions, answers to interrogatories, and admissions on file designate specific facts showing there exists a genuine issue for trial. Celotex, 477 U.S. at 324. The court may consider the offered "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any . . ." in deciding whether to grant or deny a summary judgment motion. FED. R. CIV. P. 56(c). In resolving whether a given factual dispute requires submission to a jury, the court must view the presented evidence through the prism of the substantive evidentiary burden. Anderson, 477 U.S. at 254-55. The court, however, must avoid weighing conflicting evidence for probity or making credibility determinations. Welch v. Celotex Corp., 951 F.2d 1235, 1237 (11th Cir. 1992).

## FACTS

Allegedly, Kennedy suffers from panic disorder and depression. Unchecked by medication, these disabilities, the plaintiff states, limit her ability to eat, sleep, and work. Her panic disorder allegedly causes her to suffer spontaneous anxiety attacks in which she experiences flushing, heart palpitations, sweating and an inability to catch her breath. She states that these attacks occur as frequently as thrice per week.[1] Her depression purportedly causes her sleeplessness, loss of appetite, weight loss, a lack of motivation to work, and an insurmountable sense of grief and ennui.

Kennedy was hired by Zane Smith ("Smith") for employment at Merck as a pharmaceutical sales representative on September 24, 1989. Her initial duties at Merck were the promotion of the intravenous antibiotics Mefoxin and Primaxin and other Merck products to hospitals and to physicians in rural areas. The plaintiff was also required to schedule and report her visitations with customers and to keep track of her expenses. She alleges that she reported her visitations once per year and reported her expenses monthly. According to Merck, the plaintiff was required to submit Weekly Activity Reports, routing reports every four weeks, and weekly listings of physicians.

---

[1] According to the plaintiff, she began taking medication for the panic disorder in 1989. She did not see a psychiatrist, who then changed her medication, about it until 1991.

2

Until mid-1993, the plaintiff received positive performance evaluations as a sales representative.[2] During this period, she received raises, promotions, and awards for her performance in 1992 and 1993. Starting in June 1993, Smith allegedly began to notice shortfalls in the plaintiff's performance. From June 1993 to January 1994, Smith purportedly documented several problems with the plaintiff's performance, including, a lack of preparedness in discussing products with physicians, ignoring instructions to present grant checks to physicians, waiting two months before distributing surveys on a prostate medicine, Proscar, to physicians, making mistakes in her monthly expense reports, a failure to clear her voice mail of messages for seven days, and not following instructions to place her remaining non-Proscar drugs with physicians.

In September 1993, Kennedy began raising her symptoms of anxiety and depression with Dr. Janet Wright ("Dr. Wright"), a psychiatrist at the University of Alabama at Birmingham. Apparently, the initial symptoms of depression arose with the plaintiff's entanglement in a lawsuit against her and her family for malicious prosecution and trespass. On January 12, 1994, a jury found against Kennedy and she became obligated to satisfy a judgment for $10,000. A judgment was rendered against her family for $100,000. On the next morning, at a "combined district meeting," the plaintiff fell asleep. When asked by Smith about her conduct, the plaintiff revealed that the previous night she had been at odds with her family on how the jury award against them was going to be paid. The plaintiff allegedly told Smith that, as a consequence of this argument, her relatives were no longer speaking with her. Smith suggested that she visit Merck's employee assistance program. In addition, he stated that he suspected the plaintiff's depression to be the result of her taking an illicit drug, rather than being related to the negative judgment and the estrangement from her family. Two days later, the plaintiff received a job related award of which she was the only recipient in Smith's district. On January 19, 1994, Smith provided the plaintiff with employee assistance program materials. At neither of these times did the plaintiff state to Smith that she was seeing a psychiatrist because of symptoms of depression and anxiety.

Because of the plaintiff's alleged lethargy in performing many of her employment duties, Smith gave her notice on February 2, 1994, that if she did not improve her job performance, she would be placed on a performance improvement plan ("PIP"). The plaintiff, apparently, did not

---

[2] Through much of this early period, the plaintiff suffered panic disorder, but apparently with no negative repercussions on her job performance.

stir from her lethargic state.  Therefore, on March 7, 1994, Kennedy was placed on a PIP, allegedly, to assist her in meeting her job requirements.  The PIP required the plaintiff to perform all of the responsibilities of her position, with the exception of generating a list of the physicians that were to be visited by her in the following week.  According to the plaintiff, she was required to submit mileage and expense reports daily, rather than monthly.  Also, the plaintiff alleges, she was required to submit written reports on the products she was promoting for Merck.  Through May, while the plaintiff was on her PIP, the plaintiff did not specifically request a reasonable accommodation for her depression or other psychiatric conditions.[3]

On March 15, 1994, the plaintiff was diagnosed with clinical depression by Dr. Wright who placed her on the anti-depressant Zoloft.  Kennedy soon began to suffer unpleasant physical side-effects of the Zoloft, of which she informed Smith, although it is unclear whether she informed him that she was ingesting Zoloft.  As a result of her reaction to the Zoloft, Kennedy missed fourteen and one-half days of work in the month of April.  At the end of April, she was taken off medication for a while to allow her system to detoxify.  In early May, after her physical constitution had improved, the plaintiff was prescribed Prozac.

In May 1994, Smith allegedly called Merck company headquarters and stated that plaintiff was behaving strangely.[4]  Kennedy avers that Smith then requested the Merck Health Services Department in West Point to direct a physical examination.  On Tuesday, June 7, 1996, the plaintiff arrived for a meeting with Smith at a Wendy's next door to a family practice physician's office.  Allegedly, he told the plaintiff to go next door and receive a complete physical.  The physical included a drug test.  The defendant states that the drug test was routine; the plaintiff alleges that it was extraordinary.  The plaintiff alleges that, in the process of determining her medical history, the physician inquired about her job and asked whether she was taking any medication.  The plaintiff states that she told the physician that she was having problems with Smith and that, as a result, she had ulcers and was seeing Dr. Wright for anxiety and clinical depression.  For all of these problems, Kennedy allegedly told the doctor, she was on medication.

Later that day, Kennedy broke into tears in front of Smith and requested that he remove

---

[3]  The plaintiff states that during the period in which Smith was documenting the plaintiff's allegedly inadequate job performance, she was showing marked signs of extreme weight loss, lethargy, and unwillingness or inability to go to work on a regular basis.

[4]  The strange behavior should be seen as a consequence of her depression, the plaintiff states.

her from the PIP. Smith allegedly responded that he would try to take her off of the PIP by June 30. On June 11, 1996, the plaintiff was found to be "medically qualified to perform duties of her job description."

On June 23, 1994, Dr. Wright diagnosed the plaintiff as having made significant improvement with respect to her depression. On July 1, 1994, Smith informed the plaintiff that he intended to keep her on the PIP. In response, the plaintiff wrote a letter to Merck Human Resources official Wendy Cusick, explaining that Smith was treating her unfairly. In the letter the plaintiff stated:

> . . . On January 31, Zane [Smith] put me on an actual P.I.P. for 90 days that he said would be completed at the end of April. He recommended to me the EASE [employment assistance] program to assist me with the stress and anxiety that I was experiencing. . . .
> [The plaintiff details a reduction in her territory by Smith.] This all contributed to the stress that I was already experiencing. I visited David Miller, M.D. on March 10, 1994 and he treated me for a stomach ulcer and prescribed Pepcid for me. He told me that the stresses I had been encountering were most probably the cause of this ulcer. I continued to experience increased depression and my doctor, who had already prescribed Klonopin and Anafranil decided to drop the Anafranil and add Zoloft due to the increase in depression. . . My doctor took me off of the Zoloft and after a couple of weeks, put me on Prozac.

In the letter, the plaintiff also stated that she believed Smith was discriminating against her, but she did not suggest why. At the time, however, the plaintiff apparently believed the cause of the discrimination to be her depression and panic attacks or a mistaken belief that the plaintiff was on illicit drugs.

On September 8, 1994, the plaintiff was removed from the PIP. On September 22, 1994, at the request of the plaintiff, Smith forwarded a transfer request to Bryan Brown ("Brown"), Merck regional director over Merck pharmaceutical sales in the Nashville area. After contacting Brown, Smith allegedly took no further role in the administration of the transfer request. Merck states that Smith offered to assist Kennedy in preparation for her interview, but she declined to obtain his assistance. The plaintiff alleges that Smith normally took an active role in assisting employees seeking transfers, but that he took no such role in expediting her request. In November 1994, Kennedy interviewed in Nashville, but was not selected for a position there.

On January 24, 1995, Kennedy submitted a resignation to Merck. In the letter, she stated a wish to continue working until she started her new job as a pharmaceutical salesperson with another company. On March 24, 1995, the plaintiff filed her charge with the Equal Employment Opportunity Commission ("EEOC"). The defendant claims that the charge was prompted by a

change in its vacation policy which caused the plaintiff to lose saved vacation time.

## CONTENTIONS

### I. The 180 day limitations period on filing a charge is a bar to Kennedy's claims.

The defendant argues that all of the conduct by Smith by which the plaintiff complains occurred 180 days prior to the date on which she filed her charge with the EEOC.[5]  Because it occurred prior to that time it was outside of the 180-day filing requirement imposed by § 12117(a) of the ADA.  Beavers v. American Cast Iron Pipe Co., 975 F.2d 792, 796 (11th Cir. 1992).[6]  Central to the plaintiff's claims, Merck contends, is Smith's allegedly discriminatory decision to place Kennedy on a PIP.  However, her placement on the PIP ceased on September 8, 1994.  Another of plaintiff's claims, that she was discriminatorily sent to a physician for a drug test on June 7, 1994, also accrued outside of the 180-day period.

Merck contends that the only conduct arguably timely is the transfer attempt to Nashville that was denied in late November 1994.  However, the involvement in the transfer by Smith, the only person alleged to have discriminated against the plaintiff, ended on September 22, 1994, when he forwarded materials regarding the plaintiff to Brown.  Nor, states the defendant, does evidence exist that any one in charge of the transfer at Nashville knew of the plaintiff's disability.

The plaintiff responds that the acts of Smith constituted a continuing violation.  The last act of discriminatory string of events was Smith's refusal to recommend a transfer, which occurred in November 1994.  This was the final denial of a repeated request for an accommodation, a transfer out from under Smith.

Merck replies that the plaintiff's allegations do not support a continuing violation theory. Citing Roberts v. Gadsden Memorial Hosp., 835 F.2d 793, 800 (11th Cir 1988), Merck states that a continuing violation can only be shown when a substantial nexus exists between the timely-charged claims and those that are time barred.  The substantial nexus is shown by examination of three factors: the subject matter of the discriminatory events, the frequency of the events, and the permanence of each decision.  Id. at 800-01.  In addition, the defendant states, if an employee was

---

[5] The earliest date on which a timely charged claim could have accrued is September 25, 1994.

[6] Like Title VII of the Civil Rights Act of 1964, § 2000e, et seq., § 12117(a) of the ADA provides that:

earlier capable of determining that she was being discriminated against prior to the limitations period, the violation generally is not of the sort encompassed by the continuing violation doctrine. Id. at 801.

Kennedy, the defendant claims, simply states a laundry list of allegedly discriminatory acts and contends that because one of those acts occurs within the 180 day period, a substantial nexus allowing her to assert the entirety of events exists. However, the denial of the transfer (which occurred within the 180 day period) and Smith's actions (which did not) are not only of an entirely different subject matter, but are also actions taken by entirely different decision makers.

In addition, states Merck, there is no evidence that the plaintiff's failure to obtain a transfer was the product of discrimination. Kennedy stated that she did not hit it off with one of the interviewers and acknowledged that Smith played no part in the hiring decision. In addition, the plaintiff does not present any evidence that the decision makers in Nashville had any knowledge that she was on a PIP or that she had suffered from depression. Therefore, the defendant argues, because the only purported adverse decision made within the limitations period has no discriminatory taint, the plaintiff's claim should fail.

## II. Plaintiff is incapable of demonstrating a claim of discrimination under the Americans with Disabilities Act.

To state a prima facie claim of disability discrimination under the ADA, a plaintiff must show (1) that she has a disability, (2) that she is qualified for her job and (3) that she was subjected to discriminatory treatment because of her disability. See Morisky v. Broward County, 80 F.3d 445, 447 (11th Cir. 1996). The defendant argues, first, that Kennedy's depression and panic disorder do not qualify as disabilities under the ADA, second, that Smith never knew of the disability and Kennedy never requested a reasonable accommodation, and, finally, that even if a prima facie case can be stated, Smith's decisions were based upon legitimate business reasons.

### A. Plaintiff fails to demonstrate a disability covered by the ADA.

An individual is disabled under the ADA if that person either has a physical or mental impairment that substantially limits one or more life activities, has a record of such impairment, or is regarded as having such an impairment. 42 U.S.C. § 12102(2). The defendant first contends that to demonstrate that she has a mental disability, the plaintiff must establish that her depression or

7

panic disorder is of sufficient severity and duration that it substantially limits a major life activity. 29 C.F.R. Pt. 1630.2(j)(1).

The plaintiff's depression was not of sufficient severity and duration, the defendant states, because she only suffered depression for a limited period of time. Kennedy was diagnosed with depression on March 15, 1994, and by June 23, 1994, the depression had so improved that the medication she was taking was reduced.[7] The defendant contends that in light of the short period of time that Kennedy suffered from depression and side-effects from Zoloft, her condition cannot constitute a substantial limitation on any activity. See Sanders v. Arneson Products, Inc., 91 F.3d 1351, 1354 (9th Cir. 1996).

In addition, the defendant states, no evidence exists that the depression substantially impaired the plaintiff's ability to work or engage in any other major life activity. The plaintiff admits, states the defendant, that, after she was diagnosed with depression, she was able to perform all of her essential job functions as well as she had performed them throughout her employment with Merck. During this period, points out the defendant, Kennedy became engaged, planned her wedding, took vacations and weekend getaways, entertained friends, dined out and went to movies. The only activity that the defendant states that Kennedy gave up was her workouts at the health club. However, Merck concludes, the sacrifice of a personal activity or social event on account of an infirmity does not prove a substantial limitation on a major life activity. See Soileau v. Guilford of Me., 928 F. Supp. 37, 48 (D. Me. 1996).

The plaintiff responds that both the panic disorder and the depression constitute substantial limitations on major life activities. The panic disorder, left unchecked, would interrupt her work activities from fifteen and to thirty minutes per attack, which could be triggered by environmental stimuli or no stimuli at all. Depression causes the plaintiff substantial grief and ennui, the depth of which renders her experiences a Goreyesque verisimilitude of the world as experienced by others. Her depression would be triggered by anxieties that she suffered, brought on by increases in daily stress. These ailments, states the plaintiff, are not temporary; she still takes medication for the depression and the panic disorder could manifest again at any time. The plaintiff also points out

---

[7] This statement by the defendant is misleading. The medication tapered was Klonopin, which the plaintiff had been taking in varying degrees since May of 1992 and is used to prevent anxiety attacks, not the Prozac she had been prescribed specifically for her depression. In addition, the plaintiff was not taken entirely off of the Klonopin. Instead, the prescription was reduced to about 1/3 of the prior amount, to the level at which the plaintiff had been taking the medication before she was diagnosed with depression to combat her anxiety.

that a disability must be determined "without regard to mitigating measures such as medicines . . . . For example, an individual with epilepsy would be considered to have an impairment even if the symptoms of the disorder were completely controlled by medicine." 29 C.F.R. § 1630.2(h). <u>See Liff v. Secretary of Trans.</u>, 5 NDLR ¶ 405 (D.D.C. September 22, 1994). Kennedy avers that her depression, if unmedicated, would cause her to avoid social contact and would result in her suffering a lethargy towards performing everyday activities, such as cleaning and rising from rest. Such limitations, she reasons, could be considered limitations on major life activities. <u>Guice-Mills v. Derwinski</u>, 967 F.2d 794, 797 (2d Cir. 1992). In addition, the plaintiff states that the defendant is trivializing an infirmity that is "universally" considered a significant impairment. <u>Liff v. Secretary of Trans.</u>, <u>supra</u>.

Plaintiff states that unmedicated depression would limit her in the major life activity of her work. Without medication, she states, she missed or was unconnected and dazed throughout entire days of work because of depression. Her panic disorder would cause her to unexpectedly stop whatever work activity was taking place at the time. However, she claims that in spite of these limitations on her work, she could still perform the essential functions of her job.

The defendant responds that the depression itself was a temporary ailment, that lasted at maximum six months.[8] Because it was of such short duration, it could not be a disability under the ADA. The defendant also states that the plaintiff has provided nothing but conclusory allegations that her depression caused her difficulty in socializing, sleeping, eating and working. Because no such evidence exists, states the defendant, the plaintiff cannot demonstrate interference with a major life activity such as to constitute a disability.

The defendant next maintains that no evidence exists that the plaintiff was regarded as disabled. States the defendant, there is no indication that Smith regarded the plaintiff as a drug abuser. However, even if the plaintiff were perceived as being a drug abuser, abuse of drugs does not constitute a disability under the ADA.

For Kennedy to show that Merck regarded her as disabled due to depression, she would have to prove that she suffered from depression and that Merck perceived the impairment as

---

[8] Dr. Wright apparently stated in her deposition that the depression was in remission in December 1994. There is also a mention that, when the plaintiff later attempted to stop taking Prozac for her depression, she could not do so successfully and, as a result, remains on the Prozac. However, Dr. Wright also stated that the plaintiff's inability to stop taking Prozac could be the result of withdrawal, instead of a reemergence of the depression.

substantially limiting a major life activity. Wooten v. Farmland Foods, 58 F.3d 382, 385 (8th Cir. 1995). The defendant states that no one in the Merck management could have perceived the plaintiff as disabled. According to Merck, Kennedy never told anyone at Merck that she was suffering from a disability. Nor did she submit documentation to anyone that she had a disability. Nor is there anything in the record, states the defendant, demonstrating that Smith perceived her as disabled. Even if the plaintiff complained of stress to Smith, that would not give rise to a demonstration that Smith perceived her as having a mental disability. Miller v. Nat'l Casualty Co., 61 F.3d 627, 630 (8th Cir. 1995) (citing the statement of the Seventh Circuit Court of Appeals in Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 934 (7th Cir. 1995), that the "ADA does not require clairvoyance.") Further, that Smith requested Kennedy to submit to a physical examination in May does not demonstrate the existence of the belief that the plaintiff had a substantial impairment. According to Merck, the tests are routine when an employee is not performing to job specifications.

The plaintiff responds that the defendant perceived her as having a disability. Smith perceived her, because of her depression, as having a severe drug abuse problem and, bewitched by that impression, he forced her to undergo a physical examination and a drug test. Forcing the plaintiff to undergo a physical examination, argues the plaintiff, creates a sufficient factual issue that Kennedy was perceived as having a disability limiting her employment capacity.

Finally, states the defendant, no evidence exists establishing that Kennedy had a record of mental impairment. To have a record of impairment, defendant states, the plaintiff must show that a history of a mental or physical impairment that "substantially limits one or more life activities." Roth v. Lutheran General Hosp., 57 F.3d 1446, 1457 (7th Cir. 1995). Because, defendant states, the plaintiff cannot prove that her impairment substantially limits one or more of her life activities, she cannot be said to have a disability.

## B. Plaintiff neither notified Merck of her disability nor requested a reasonable accommodation.

The defendant states that it could not have discriminated against her, first, because it did not know of her disability and, second, because the plaintiff did not ask for a reasonable accommodation.

> To prove discrimination, an employee must show that the employer knew of such employee's substantial physical or mental limitation. . . .

10

[W]hile a given disability may limit one employee (and therefore necessitate a reasonable accommodation), it may not limit another. For this reason, the ADA does not require an employer to assume that an employee with a disability suffers from a limitation. . . . [I]t is incumbent upon the ADA plaintiff to assert not only a disability, but also any limitation resulting therefrom. . . .

    Where the disability, resulting limitations, and necessary reasonable accommodations, are not open, obvious, and apparent to the employer, as is often the case when mental disabilities are involved, the initial burden rests primarily upon the employee, or his health-care provider, to specifically identify the disability and resulting limitations, and to suggest the reasonable accommodations.

Taylor v. Principal Financial Group, Inc., 93 F.3d 155, 163-65 (5th Cir. 1996). The defendant states that the closest the plaintiff ever came to informing Merck of a mental disability was in January 1994, when she informed Smith of the judgment rendered against her. However, the defendant states, that conversation could only have led Smith to believe that Kennedy was depressed or sick, not that she had any clinically diagnosed condition. Quoting the Eleventh Circuit Court of Appeals's opinion in Morisky v. Broward County, 80 F.3d at 448, the defendant states, "Vague or conclusory statements revealing an unspecified incapacity are not sufficient to put an employer on notice of its obligations under the ADA."

Nor, states Merck, should it have inferred a disability based upon poor work performance. Poor performance is evidence of that alone. It is undisputed, contends the defendant, that Kennedy never told Smith that she could not perform her job. Nor did she inform him of limitations on her ability to perform her work. Every time that Smith discussed poor performance with the plaintiff, maintains Merck, she indicated that she could and would complete her assigned tasks.

That Kennedy requested to be taken off of her PIP, could not be sufficient to place Smith on notice of a limitation on her ability to perform her job, asserts the defendant. Nor could her request for a transfer be interpreted that way. The evidence does not suggest any way in which a Nashville position could be differentiated from her position under Smith. That the problem was Smith is unresolvable by the ADA, as the statute only requires accommodations be made for limitations imposed by a disability, not inability to work for a particular employer. The ADA, states the defendant, citing Wernick v. Federal Reserve Bank of New York, 91 F.3d 379, 384 (2d Cir. 1996), does not require an employer to accommodate a disabled employee by transferring her away from a disfavored supervisor.

The plaintiff responds that she did inform Smith in January 1994 about her problems and

that her requests to be taken off of the PIP and for a transfer were specific enough to require Merck to inquire into providing a reasonable accommodation to her.

The defendant replies that the plaintiff never informed Smith that she could not perform the essentials of her job or that she had any limitations on her ability to work.

**3. The plaintiff cannot prove that Merck discriminated against her on the basis of her alleged disability.**

The defendant argues that no evidence exists that Kennedy was discriminated against on the basis of her disability. The basis of all of the adverse actions taken by Smith was the plaintiff's poor employee performance. Also, no relation between the adverse transfer decision and plaintiff's alleged disabilities can be shown, Merck states. Instead, the defendant states, the failure to obtain a transfer was the result of the plaintiff's inability to "hit it off" with one of the Nashville decision makers.

## III. Plaintiff cannot state a claim for constructive discharge.

Merck contends that the plaintiff cannot demonstrate a constructive discharge, first, because no evidence exists that the circumstances of her employment were so intolerable that she was forced to resign and, second, because the only event within the statute of limitations which the plaintiff construes as an adverse employment decision, the denial of transfer, occurred four months prior to her resignation.[9]

In Kilgore v. Thompson & Brock Mgt., Inc., 93 F.3d 752, 754 (11th Cir. 1996), the Eleventh Circuit Court of Appeals stated, "To prove constructive discharge, employees must demonstrate that their working conditions were so intolerable that a reasonable person in their position would be compelled to resign." Merck states that because the plaintiff's personal life and work life improved during the last six months, her circumstances cannot be proven so intolerable that a reasonable person would feel compelled to resign. In her resignation letter, the plaintiff gave no indication of dissatisfaction with her employment:

> I have enjoyed the past five and one half years with Merck and will miss the Company along with all of the wonderful people. Merck is a very reputable and ethical company which I am glad to have been part of and I am sure I will take all of that Merck knowledge and wisdom

---

[9] Factually, the difference in time between denial of transfer and the decision to resign appears to be closer to two months.

with me forever. . . . Thank you very much for allowing me this opportunity with Merck and Co.

In <u>Steele v. Offshore Shipbuilding, Inc.</u>, 867 F.2d 1311, 1317-18 (11th Cir. 1989), the Eleventh Circuit Court of Appeals found no constructive discharge when the plaintiffs resigned twelve days after the last act of harassment against them. In this case, the defendant points out, the last adverse act, the denial of a transfer, occurred almost four months prior to Kennedy's resignation. The plaintiff responds that because the conduct of Smith communicated to her that she was no longer trusted or respected and that he would not transfer her, she had no choice but to resign.

## ANALYSIS

All of the plaintiff's claims based upon acts occurring prior to September 25, 1994, are time-barred. To be actionable under Title VII, an alleged discriminatory act must occur with within 180 days of the filing of an EEOC charge. Events which occur prior to the 180 day filing period are barred, unless the 180 day period is equitably tolled or the prior acts constitute elements of a continuing violation. <u>Abrams v. Baylor College of Medicine</u>, 805 F.2d 528, 532-33 (5th Cir. 1983). To prove a continuing violation, the plaintiff must show that the acts complained of are part of a pattern or policy of discrimination maintained against her as of at least 180 days prior to the filing of an EEOC charge. The perpetuation of the effect of a previous act of discrimination committed outside of the filing period does not give rise to a continuing violation. <u>United Airlines v. Evans</u>, 431 U.S. 553, 558 (1983). Nor is an unconnected string of discrete discriminatory acts against the plaintiff a continuing violation. <u>Berry v. Board of Sup'rs.</u>, 715 F.2d 971, 981 (5th Cir. 1983).

A plaintiff cannot assert that a continuing violation exists on the basis of a series of discrete acts, where a discriminatory animus arcs purposelessly from one act to the next. There is no single force behind all of the acts which are the subject of the suit. Instead, the independent acts are the subject of the suit. A continuing violation exists only where a current policy of discrimination energizes all adverse actions taken. In such an instance, the suit is against that policy, in addition to the acts themselves.

"Whether a discriminatory act constitutes a continuing violation of Title VII...is a finding of fact..." <u>Calloway v. Partners Nat. Health Plans</u>, 986 F.2d 446, 448 (11th Cir. 1993). Of course, as

13

always, if there is no reasonable factual inference, the issue must determined as one of law.

Berry v. Board of Sup'rs of L.S.U., 715 F.2d 971, 981 (5th Cir. 1983), sets out a series of non-exhaustive factors to be employed in determining whether acts occurring prior to the 180 day period are sufficiently relevant to the timely brought action to constitute part of a continuing violation:

> Relevant to the determination are the following factors, which we discuss, but by no means consider to be exhaustive. The first is subject matter...The second is frequency. Are the alleged acts recurring or more in the nature of an isolated work assignment or employment decision. The third factor, perhaps of most importance, is degree of permanence.. Does the act have the degree of permanence which should trigger an employee's awareness of and duty to assert his or her rights, or which should indicate to the employee that the continued existence of the adverse consequences of the act is to be expected without being dependent on a continuing intent to discriminate.

In Roberts v. Gadsden Memorial Hospital, 850 F.2d 1549, 1550 (11th Cir. 1988), the court said:

> Therefore, unless the 1978 incident constituted a continuing violation, Roberts' claim for relief stemming from the 1978 incident was time-barred and the District Court erred in granting relief on the basis of that claim. See Burnham v. Amoco Container Co., 755 F.2d 893 (11th Cir. 1985). Here, even if we assume that the 1978 discriminatory act continued into the statutory filing period, we must still conclude that Roberts' claim based on the incident is time-barred. Roberts admitted that he was aware of his rights in 1978. He could have asserted them at that time. To the extent that GMH injured him on a continuing basis as a result of the 1978 incident, it was only because he knowingly failed to exercise his rights. A claim arising out of an injury which is 'continuing' only because a putative plaintiff knowingly fails to seek relief is exactly the sort of claim that Congress intended to bar by the 180-day limitation period.

Here, Smith's adverse actions share none of the same subject matter. They had the permanence to alert the plaintiff that the allegedly discriminatory acts were occurring against her. Therefore, she should have asserted her claims when they accrued.

No constructive discharge claim is stated here either. Perhaps the plaintiff's work situation could have been arguably intolerable in the early part of 1994, but her situation only shows improvement through the later part of the year. In addition, she resigned two months after the transfer was denied and wrote a thank you note.

The plaintiff states the bare skin of a triable issue of fact on her denial of transfer claim. First, the plaintiff has raised a genuine issue of fact that her clinical depression is of sufficient severity that it constitutes a disability. Second, Merck officials might well have known of Kennedy's disability, based upon the medical history of her that it gathered in the June 7 examination and based upon the letter that she sent to Merck Human Resources. This is sufficient to state a prima facie case of disability discrimination. Merck has not offered any clear legitimate business reason to

the contrary or, at least, no reason that cannot be debated based upon the facts of the case. If a person is depressed, placing that person under a more understanding and sympathetic supervisor may be a reasonable accomodation. The plaintiff may be required to do a better job of presenting evidence on this issue at trial, but at present, summary judgment on this issue is inappropriate.

## CONCLUSION

For the foregoing reasons, the defendant's motion for summary judgment will be **GRANTED**. except on the discriminatory denial of transfer claim, on which the motion will be **DENIED**.

This 29th day of January 1997.

ROBERT B. PROPST
SENIOR UNITED STATES DISTRICT JUDGE

15